UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MICHAEL WAPPLER,

        Plaintiff,                           Hon. Paul L. Maloney

v.                                          Case No. 4:05 CV 90

MATTHEW BREVARD, et al.,

        Defendants.

_____/


## REPORT AND RECOMMENDATION

This matter is before the Court on Defendants Brevard, Mikkelsen and Tucker's Rule 56(b) Motion for Summary Judgment, (dkt. #212), Plaintiff's Motion to Hold Defendants' Dispositive Motion in Abeyance, (dkt. #224), and Plaintiff's Motion that Defendant Produce Complete and Sworn Deposition Transcripts, (dkt. #229). Pursuant to 28 U.S.C. § 636(b)(1)(B) granting authority for United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of motions for summary judgment, the undersigned recommends that Plaintiff's motions both be **denied** and Defendants' motion be **granted in part and denied in part**.


## BACKGROUND

In his second amended complaint, Plaintiff asserts a variety of claims against several defendants, some of which have previously been dismissed. Plaintiff's claims against Defendants Brevard, Mikkelsen, and Tucker concern varied and unconnected incidents, each of which is described in detail below. In brief, Plaintiff asserts that Defendants conspired to censor his outgoing mail in

violation of his First Amendment rights, as well as his right not to be denied the equal protection of the laws.  Plaintiff asserts that Defendants conspired to open his legal mail outside his presence in violation of First Amendment rights.  Plaintiff also claims that by so acting Defendants unlawfully converted (contrary to Michigan law) his personal property.  Finally, Plaintiff asserts that Defendants improperly retaliated against him for exercising his constitutional rights.

## STANDARD

In reviewing a motion for summary judgment, the Court must confine itself to the narrow questions of whether there exist "no genuine issue[s] as to any material fact and [whether] the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  On a Rule 56 motion, the Court cannot try issues of fact, but is empowered to determine only whether there exist issues in dispute to be decided in a trial on the merits.  *See Perez v. Aetna Insurance Co.*, 96 F.3d 813, 819 (6th Cir. 1996).  The crux of the motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

A motion for summary judgment requires the Court to view "inferences to be drawn from the underlying facts...in the light most favorable to the party opposing the motion."  *Matsushita Electric Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The opponent, however, has the burden to show that a "rational trier of fact [could] find for the non-moving party [or] that there is a 'genuine issue for trial.'"  *Historic Preservation Guild of Bay View v. Burnley*, 896 F.2d 985, 993 (6th Cir. 1989).

As the Sixth Circuit has recognized, the Supreme Court has encouraged the granting of summary judgments, as such may be "an appropriate avenue for the 'just, speedy and inexpensive

determination' of a matter." *Kutrom v. City of Center Line*, 979 F.2d 1171, 1173 (6th Cir. 1992).

Consistent with this concern for judicial economy, "the mere existence of a scintilla of evidence in

support of the [non-moving party's] position will be insufficient." *Anderson*, 477 U.S. at 252.

Furthermore, mere allegations do not suffice. *See Cloverdale Equip. Co. v. Simon Aerials, Inc.*, 869 F.2d

934, 937 (6th Cir. 1989) ("the party with the burden of proof at trial is obligated to provide concrete

evidence supporting its claims and establishing the existence of a genuine issue of fact").

## ANALYSIS

### I.        Outgoing Mail Claim

In Count IV of his second amended complaint, Plaintiff makes the following assertions.

Plaintiff subscribed to Maxim magazine.  (Dkt. #89 at ¶¶ 84, 181).  In August or September 2002,

Plaintiff received an invoice from Maxim in the amount of $17.94.[1]  (Dkt. #240, Exhibit H).  Plaintiff,

however, lacked the funds to pay this obligation in full.  (Dkt. #89 at ¶ 88).  Instead, Plaintiff authorized

prison officials to disburse $3.00 to Maxim in partial payment of his subscription bill.  (Dkt. #89 at ¶

85; Dkt. #240, Exhibits H and J).  Defendant Mikkelsen approved this disbursement.  (Dkt. #89 at ¶ 86;

Dkt. #240, Exhibit J).   On October 17, 2002, Defendant Tucker refused to process Plaintiff's

disbursement on the ground that "subscriptions must be paid in full."  (Dkt. #89 at ¶ 89; Dkt. #240,

Exhibit J).

In response, Plaintiff initiated two separate grievances.  (Dkt. #89 at ¶ 90).  In the first

grievance (#893), Plaintiff alleged that Defendant Tucker's action violated MDOC policy as well as

---

[1]  The invoice indicated that as part of Plaintiff's subscription agreement, Maxim sent him an initial "free issue" as well as a second issue "on good faith."  (Dkt. #240, Exhibit H).

provisions of Michigan Administrative Law.  (Dkt. #89 at ¶ 90; Dkt. #89, Exhibit C).  In the second grievance (#894), Plaintiff alleged that his inability to use the funds in his prison trust account constituted an "interfer[ence] with interstate commerce under federal law."  (Dkt. #89 at ¶ 90; Dkt. #89, Exhibit D).  Defendant Brevard "rejected" grievance #893.  (Dkt. #89 at ¶ 93; Dkt. #89, Exhibit C).  According to Plaintiff, this action "was a deliberate act to conceal the First Amendment violation and to prevent Plaintiff from exhausting the grievance process to frustrate and impede presentation of civil actions to the courts."  (Dkt. #89 at ¶ 93).  With respect to grievance #894, Defendant Brevard directed Kathryn Rabbitt to investigate and respond thereto.  (Dkt. #89 at ¶¶ 98-99).  Plaintiff asserts that by assigning the matter to Ms. Rabbitt for resolution, Defendant Brevard "violated MDOC policy and procedure" which requires that grievances be investigated by "the supervisor of the person being grieved."  (Dkt. #89 at ¶ 99).

On October 24, 2002, Plaintiff authored a letter to Maxim, in which he acknowledged that he "cannot pay the full amount" of his subscription.  (Dkt. #89 at ¶ 102; Dkt. #240, Exhibit N).  Plaintiff asserts that Defendant Tucker "intercepted and/or censored" this letter.  (Dkt. #89 at ¶ 103).

Plaintiff asserts that the actions undertaken by Defendants Tucker and Brevard violate his First Amendment rights to freedom of speech and freedom of the press, as well as his rights under the Equal Protection Clause of the Fourteenth Amendment.  (Dkt. #89 at ¶ 181).  Plaintiff further asserts that Defendants Tucker and Brevard unlawfully conspired to violate his constitutional rights.  (Dkt. #89 at ¶ 181).

A.      Plaintiff's Claims Against Defendant Brevard

Aside from the conspiracy allegations, discussed below, the only allegations which Plaintiff asserts against Defendant Brevard relative to this incident are that Brevard improperly rejected a grievance and assigned the resolution of another grievance to the wrong person.  Such claims fail to state a claim on which relief may be granted.

Liability in a § 1983 action cannot be premised upon passive behavior or an alleged failure to act, rather liability must be based upon active unconstitutional behavior.  *Salehpour v. University of Tennessee*, 159 F.3d 199, 206-07 (6th Cir. 1998), *cert. denied*, 526 U.S. 1115 (1999). Accordingly, liability in a § 1983 action does not attach based upon allegations that a defendant simply denied or improperly processed a prisoner's grievance.  *See Skinner v. Govorchin*, 463 F.3d 518, 525-26 (6th Cir. 2006); *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999); *Lee v. Michigan Parole Board*, 2004 WL 1532563 at *2 (6th Cir., June 23, 2004) ("[s]ection 1983 liability may not be imposed simply because a defendant denied an administrative grievance or failed to act upon information contained in a grievance"); *Alder v. Correctional Medical Services*, 2003 WL 22025373 at *2 (6th Cir., Aug. 27, 2003) ("[t]he mere denial of a prisoner's grievance states no claim of constitutional dimension").

B.      Plaintiff's Claims Against Defendant Tucker

Plaintiff asserts that by denying his attempts to make partial payments of his magazine subscription bill, Defendant Tucker violated his First Amendment rights to freedom of speech and freedom of the press, as well as his Fourteenth Amendment right not to be denied the equal protection of the laws.

1.      First Amendment Claim

Courts have long recognized that prisoners possess a First Amendment right to receive mail from outside sources, including mail-order sources. *See, e.g., Brooks v. Seiter*, 779 F.2d 1177, 1180 (6th Cir. 1985). Moreover, it is well accepted that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *see also, Turner v. Safley*, 482 U.S. 78, 84 (1987) ("[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution"). Operating a prison, however, is a difficult task requiring "expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner*, 482 U.S. at 85.

Recognizing this, courts have consistently held that issues involving "the adoption and execution of policies and practices that in [the] judgment [of prison officials] are needed to preserve internal order and discipline and to maintain institutional security" in most circumstances "should be accorded wide-ranging deference." *Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (quoting *Wolfish*, 441 U.S. at 547); *see also*, *Bazzetta v. McGinnis*, 124 F.3d 774, 779 (6th Cir. 1997) (issues involving prison administration are properly resolved by prison officials, and the solutions at which they arrive should be accorded deference).

Accordingly, when reviewing an inmate's claim of constitutional violation, courts must balance this policy of judicial restraint with the need to protect inmates' constitutional rights. *See Turner*, 482 U.S. at 85. The standard by which this balancing occurs was articulated by the *Turner* Court, which held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. This standard

represents a "reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Flagner*, 241 F.3d at 481 (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987)).

The *Turner* Court identified four factors that are relevant in determining the reasonableness of a challenged prison regulation:

1.  there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;

2.  whether there are alternative means of exercising the right that remain open to prison inmates;

3.  the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and

4.  whether there are ready alternatives available that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.

*Flagner*, 241 F.3d at 484 (quoting *Turner*, 482 U.S. at 89-91).

Failure to satisfy the first factor renders the regulation unconstitutional, without regard to the remaining three factors. If the first factor is satisfied, the remaining three factors are considered and balanced together; however, they are "not necessarily weighed evenly," but instead represent "guidelines" by which the court can assess whether the actions at issue are reasonably related to a legitimate penological interest. It should further be noted that the *Turner* standard is not a "least restrictive alternative" test requiring prison officials "to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." Instead, the issue is simply whether the policies at issue are reasonably related to a legitimate penological interest. *Id.*

Pursuant to Michigan Department of Corrections policy, prisoners "shall not be permitted to purchase or order goods or services on a credit or cash-on-deliver (i.e., C.O.D.) basis." Michigan

Department of Corrections Policy Directive 04.02.105 ¶ U (effective March 11, 2002).  The facility in which Plaintiff was then incarcerated had in place a similarly worded policy which likewise prohibited prisoners from purchasing goods or services on a credit or C.O.D. basis.  (Dkt. #213, Exhibit 16). Pursuant to these policies, Plaintiff was not permitted to pay for his magazine subscription in credit installments, but was instead required to pay the entire cost when due.

Defendant asserts that these policies are designed to protect prisoners from ordering materials for which they cannot pay.  They further protect the businesses from which prisoners might otherwise attempt to purchase items on credit.  Courts have acknowledged the legitimacy of such goals. *See, e.g., Eckford-El v. Toombs*, 760 F.Supp. 1267, 1271 (W.D. Mich. 1991) (prison officials have a legitimate interest in preventing prisoners from engaging in credit transactions); *Lena v. Dubois*, 1994 WL 99940 at *1 (1st Cir., Mar. 23, 1994) (prison officials have a legitimate interest in preventing "inmates from committing fraud on businesses and obligating funds beyond their means").  The Court likewise concludes that prison officials have a legitimate interest in preventing prisoners from engaging in credit transactions.  The Court further concludes that there exists a valid, rational connection between this interest and the prison policies at issue.

As for the remaining *Turner* factors, such do not weigh in Plaintiff's favor.  The regulations at issue do not prevent Plaintiff from receiving magazines or other reading material through the mail or otherwise.  In fact, as previously noted, before defaulting on his payment obligation Plaintiff was permitted to receive two copies of Maxim magazine.  The regulations pursuant to which Defendant Tucker acted simply prevent prisoners from obtaining reading material on credit.  While the Court understands Plaintiff's frustration in this matter, the impact of these regulations on Plaintiff's ability to exercise his First Amendment right to receive reading material is negligible.  Moreover, the resources

of the MDOC are limited and the Court must accord "wide-ranging deference" to the solutions implemented by prison officials to effect legitimate penological goals. The Court concludes, therefore, that Defendant Tucker's actions did not violate Plaintiff's First Amendment rights.

### 2. Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Accordingly, the state "cannot make distinctions which either burden a fundamental right, target a suspect class, or intentionally treat one differently from others similarly situated without any rational basis for the difference." *Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 312 (6th Cir. 2005) (citations omitted).

While Defendant Tucker's actions arguably burdened a fundamental right, namely Plaintiff's right to receive mail, as detailed above there exists a legitimate reason for doing so. Plaintiff also offers the conclusory allegation that prison officials allowed "other prisoners similarly situated to make partial payments for magazines and publications." (Dkt. #89 at ¶ 181). However, Plaintiff has failed to describe with any particularity these allegations and, moreover, has offered no evidence in support thereof. As is well recognized, conclusory allegations unsupported by any evidence are insufficient to withstand a motion for summary judgment. *See, e.g., Brower v. Works*, 41 Fed. Appx. 802, 803 (6th Cir., Aug. 2, 2002) (citing *Cincinnati Bell Tel. v. Allnet Comm. Servs.*, 17 F.3d 921, 923-24 (6th Cir. 1994)). Finally, Plaintiff offers no evidence that he is a member of a "suspect" class. Accordingly, the Court finds that Defendant Tucker's actions did not violate Plaintiff's right to not be denied the equal protection of the laws.

3.    Conspiracy Claim

Plaintiff asserts that Defendants Tucker and Brevard conspired to deprive him of the rights discussed immediately above. Plaintiff has failed to indicate whether this particular claim is grounded in federal or state law. This is of no consequence, however, as Plaintiff's claim fails under either body of authority.

Under federal law, it is improper for "two or more persons" to conspire "for the purpose of depriving, either directly or indirectly," an individual of his civil rights. 42 U.S.C. § 1985. As discussed above, Plaintiff cannot establish that the alleged conspiracy deprived him of a right or privilege protected by the laws or Constitution of the United States. *See Sawyer v. Lexington-Fayette Urban County Government*, 2001 WL 1006237 at *2 (6th Cir., Aug. 21, 2001) (citing *Collyer v. Darling*, 98 F.3d 211, 233 (6th Cir. 1996)). Plaintiff's conspiracy claim also fails under Michigan law. *See Karkoukli's, Inc. v. Walgreen Co.*, 2004 WL 435384 at *10-11 (Mich. Ct. App., Mar. 9, 2004) ("a claim for civil conspiracy may not exist in the air; rather, it is necessary to prove a separate, actionable tort").

In sum, for the reasons articulated above, the Court recommends that Defendants Brevard and Tucker are entitled to summary judgment as to the claims asserted in Count IV of Plaintiff's second amended complaint.

## II.        Retaliation Claims

In Count IX of his second amended complaint, Plaintiff makes the following allegations. On April 16, 2003, Plaintiff was placed on modified grievance access. (Dkt. #89 at ¶¶ 145, 186). This action was undertaken "upon [Defendant] Brevard's recommendation." *Id.* at ¶ 145. Plaintiff was maintained on modified grievance access status until July 16, 2003. *Id.* at ¶ 147. During the time that

Plaintiff was on modified grievance access status, he sought alternative methods "to petition for redress of grievances." *Id.* at ¶¶ 149-55. One of the alternative methods which Plaintiff employed was to write two letters to the Director of the Michigan Civil Service Commission. *Id.* at ¶ 156. Instead of mailing these letters, however, as Plaintiff requested, Defendant Tucker "intercepted" them and returned them to Plaintiff. *Id.* Plaintiff asserts that Defendant Tucker refused to process his outgoing mail in retaliation for exercising his First Amendment rights. *Id.* at ¶¶ 156, 186. Plaintiff asserts that Defendant Brevard placed him on modified grievance status in retaliation for filing grievances about the manner in which his legal mail was processed by prison officials. *Id.* at ¶ 146b.

### A.     Defendant Tucker

To prevail on his retaliation claim, Plaintiff must establish the following: (1) he was engaged in constitutionally protected conduct, (2) he suffered adverse action which would deter a person of "ordinary firmness" from continuing to engage in such protected conduct, and (3) there exists a causal connection between the protected conduct and the adverse action - in other words, the adverse action was motivated at least in part by his protected conduct. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

### 1.     Protected Conduct

The First Amendment protects inmates against "unjustified governmental interference" with their mail. *Procunier v. Martinez*, 416 U.S. 396, 408-09 (1974), *overruled in part on other grounds*, *Thornburgh v. Abbott*, 490 U.S. 413 (1989). Interference with an inmate's outgoing mail is justified only where (1) the "regulation or practice in question" furthers "an important or substantial

governmental interest unrelated to the suppression of expression," and (2) "the limitation of First Amendment freedoms" is "no greater than is necessary or essential to the protection of the particular governmental interest involved." *Martinez*, 416 U.S. at 413. Defendant has presented neither evidence nor argument that the alleged interference with Plaintiff's mail was prompted by penological concerns or other legitimate governmental interests. The Court concludes, therefore, that Plaintiff was engaged in constitutionally protected conduct when he sought to communicate through the mails with the Director of the Michigan Civil Service Commission.

### 2.      Adverse Action Which Would Deter a Person of Ordinary Firmness

As the Sixth Circuit has indicated, "in most cases, the question of whether an alleged retaliatory action poses a sufficient deterrent threat to be actionable will not be amenable to resolution as a matter of law." *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002). As the *Bell* court further stated, "while certain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations, this threshold is intended to weed out *only inconsequential actions*." *Id.* at 603. Accordingly, "unless the claimed retaliatory action is truly 'inconsequential,' the plaintiff's claim should go to the jury." *Id.* Interference with an inmate's outgoing mail, the contents of which allegedly concerned the conditions under which Plaintiff was incarcerated, can hardly be said to constitute inconsequential or de minimis conduct. Accordingly, the Court finds that there exist unresolved questions of fact regarding this particular element of the analysis.

3.  Causal Connection

Plaintiff must also establish that the adverse action taken against him was motivated, at least in part, by the protected conduct in which he engaged.  In examining this element, Defendant's subjective motivation is at issue, and as has been recognized, while Plaintiff is not subject to a heightened pleading standard, his burden is not trivial.  As courts have long recognized, retaliation is "easy to allege" and "can seldom be demonstrated by direct evidence."  *Huff v. Rutter*, 2006 WL 2039983 at *7 (W.D. Mich., July 19, 2006) (quoting *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987)).  Accordingly, "bare allegations of malice" are insufficient to state a constitutional claim, as Plaintiff must instead establish "that his protected conduct was a motivating factor" behind the allegedly retaliatory action taken.  *Thaddeus-X*, 175 F.3d at 399.  In other words, Plaintiff must articulate "a chronology of events from which retaliation may plausibly be inferred."  *Desmone v. Adams*, 1998 WL 702342 at *3 (6th Cir., Sep. 23, 1998) (citations omitted).

Plaintiff has failed to allege a chronology of events from which a reasonable person could conclude that Plaintiff was the subject of improper retaliation.  Instead, Plaintiff has simply alleged in wholly conclusory fashion that Defendant Tucker subjected him to improper retaliation.  Such allegations fail to satisfy the relevant standard.  *See, e.g., Brown v. Gerth*, 2007 WL 2480526 at *7 (W.D. Mich., June 6, 2007) (citations omitted) ("[c]onclusory allegations of retaliatory motive with no concrete and relevant particulars fail to raise a genuine issue of fact for trial").  Accordingly, the Court recommends that Defendant Tucker be granted summary judgment as to this particular claim.

B.     Defendant Brevard

Plaintiff asserts that, at Defendant Brevard's behest, he was placed on modified grievance access as retaliation for filing grievances.  Even assuming Plaintiff can establish the first and third prongs of the analysis, he has failed to allege that he suffered an adverse action which would deter a person of ordinary firmness from continuing to file grievances.  The Sixth Circuit has repeatedly held that "[b]eing placed on modified [grievance] access status would not deter a person of ordinary firmness from pursuing non-frivolous grievances against prison officials, within the courts or the prison administrative system." *Jackson v. Madery*, 158 Fed.Appx. 656, 660 (6th Cir., May 30, 2006); *see also*, *Walker v. Michigan Dep't of Corrections*, 128 Fed.Appx. 441, 446 ("an ordinary person of reasonable firmness would not be deterred from filing legitimate grievances by a policy that merely provided that a grievance officer would screen frivolous grievances"); *Moore v. Sergent*, 22 Fed.Appx. 472, 474 (Oct. 26, 2001) (because a prisoner on modified access is "still free to file grievances. . .he has not been subjected to retaliation"); *Kennedy v. Tallio*, 20 Fed.Appx. 469, 471 (6th Cir., Sept. 26, 2001) (placement on modified grievance access does not constitute adverse action sufficient to deter a person of ordinary firmness from continuing to engage in protected conduct).  Accordingly, the Court recommends that Defendant Brevard is entitled to summary judgment as to this particular claim.

C.     Conspiracy Claim

Plaintiff also alleges that Defendant Tucker and Brevard entered into a conspiracy to subject him to improper retaliation.  As discussed above, because Plaintiff has failed to demonstrate that the alleged conspiracy deprived him of a right or privilege protected by the laws or Constitution of the United States or of the State of Michigan his conspiracy claims must likewise fail.

-14-

In sum, for the reasons articulated above, the Court recommends that Defendants Brevard and Tucker are entitled to summary judgment as to the claims asserted in Count IX of Plaintiff's second amended complaint.

III.        **Incoming Legal Mail Claims**

The following allegations are contained in Count VII of Plaintiff's second amended complaint and other pleadings.  On January 23, 2003, an attorney (who was representing Plaintiff in another legal matter) forwarded to Plaintiff various legal documents, at least one of which required Plaintiff's signature and return (hereinafter referred to as the January 23, 2003 mailing).  (Dkt. #89 at ¶¶ 106-07, 184).  These documents were mailed in an envelope on which the following was written: "Private and Confidential Attorney Client Privilege."  *Id.* at ¶ 106.  Included with this mailing were "three pre-posted First Class Mail envelopes pre-addressed for return mail to the attorneys, and an Overnight Mail envelope to return signed documents to the law-firm quickly."  *Id.* at ¶ 107.

Prior to May 2002, Plaintiff requested that his incoming legal mail be opened only in his presence.  (Dkt. #240, Exhibit D).  On May 21, 2002, a prison official identified as "KTucker" (presumably Defendant Tucker) acknowledged to Plaintiff that prison officials were aware of his request for "special handling for legal mail."  *Id.*  Despite Plaintiff's request that his incoming legal mail be opened in his presence, on February 4, 2003, Defendant Tucker opened and read - outside of Plaintiff's presence - the January 23, 2003 mailing from Plaintiff's attorney.  (Dkt. #89 at ¶ 108).  Defendant Tucker "seized" this mail and completed a "Notice of Mail Rejection Form" which was provided to Plaintiff on February 11, 2003.  (Dkt. #89 at ¶¶ 108-12; Dkt. #89, Exhibit E).  Plaintiff requested a hearing regarding the seizure of his legal mail.  (Dkt. #89 at ¶ 113; Dkt. #89, Exhibit E).

Defendant Mikkelsen has submitted a copy of the Administrative Hearing Report he completed regarding this matter.  (Dkt. #213, Exhibit 5).  Plaintiff does not dispute the authenticity of this document or the accuracy of the Report's contents, but instead asserts that Defendant Mikkelsen did not actually conduct a hearing in the matter as requested.  *Id.* at ¶ 123.  Pursuant to MDOC policy, inmates are not permitted to receive mail "containing physical contraband," the definition of which "includes postage stamps, except that a prisoner may receive a single stamped self-addressed envelope from an attorney, a court or a legitimate religious organization."  Michigan Department of Corrections Policy Directive 05.03.118 ¶ D (effective Nov. 1, 2002).  According to Defendant Mikkelsen's report, dated February 13, 2003, Plaintiff was permitted to keep one of the self-addressed stamped envelopes contained in the January 23, 2003 mailing, but the remaining pre-stamped envelopes were confiscated pursuant to the aforementioned policy.  (Dkt. #213, Exhibit 5).  On March 13, 2003, Defendant Tucker notified Plaintiff that she had "disposed" of the mail determined by Defendant Mikkelsen to constitute contraband.  *Id.* at ¶ 125.  Plaintiff asserts that Defendant Tucker disposed of his mail in retaliation for having been the subject of previous grievances filed by Plaintiff.  *Id.* at ¶ 131.

The following allegations are contained in Count VIII of Plaintiff's second amended complaint and other pleadings.  On February 21, 2003, Plaintiff received another mailing from his attorney which had been previously opened by Defendant Tucker outside of Plaintiff's presence (hereinafter referred to as the February 21, 2003 mailing).  (Dkt. #89 at ¶ 135; Dkt. #89, Exhibit G).  On February 25, 2003, Plaintiff submitted to Defendant Brevard a grievance concerning the opening of this mail outside his presence.  (Dkt. #89 at ¶ 135b; Dkt. #89, Exhibit G).  Defendant Brevard rejected this grievance as duplicative of another grievance Plaintiff had filed.  (Dkt. #89 at ¶ 136; Dkt. #89, Exhibit

G).  Plaintiff further asserts that during his incarceration at MCF, Defendant Tucker opened more than

fifty (50) items of his "confidential legal mail" outside of his presence.  (Dkt. #89 at ¶¶ 118b, 143).

Plaintiff alleges that Defendant Tucker's conduct violated his First Amendment rights

and, furthermore, constituted conversion under Michigan law.  Plaintiff asserts that Defendant Brevard

violated his First Amendment rights and that Defendant Mikkelsen violated his right to procedural due

process.

A.      Opening of Plaintiff's Legal Mail

As described above, Plaintiff asserts that Defendant Tucker, on numerous occasions,

opened his legal mail outside his presence, despite Plaintiff having previously requested that his legal

mail be opened only in his presence.  Defendant Tucker asserts that she is entitled to qualified immunity

regarding such claims.  Before addressing the merits of Defendant Tucker's qualified immunity defense,

however, the Court must first resolve the parties' dispute as to precisely which alleged incidents are

encompassed by Plaintiff's complaint.

1.      Scope of Plaintiff's Second Amended Complaint

As discussed above, in his amended complaint Plaintiff makes very specific allegations

regarding the January 23, 2003 and February 21, 2003 mailings.  Defendant does not dispute that these

particular allegations are sufficient to put her on notice as to those two alleged incidents.  (Dkt. #243)[2].

Rather the dispute centers around the allegation in Plaintiff's second amended complaint, noted above,

---

[2]  In this pleading, Defendant makes reference to "the two pieces of mail dated January 29, 2003, and February 4, 2003."
This difference in dates notwithstanding, it is clear to the Court that Defendant is referring to the two incidents described in detail
in Counts VII and VIII of Plaintiff's second amended complaint.

that Defendant Tucker also opened more than fifty (50) items of his "confidential legal mail" outside of his presence.  Defendant Tucker asserts that such claims are not properly before the Court.

Federal Rule of Civil Procedure 8(a) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  This standard is not satisfied by "bare assertions of legal conclusions."  *Saltire Industrial, Inc. v. Waller, Lansden, Dortch & Davis, PLLC*, 491 F.3d 522, 526 (6th Cir. 2007).  However, Rule 8 "is commonly understood to embody a regime of 'notice pleading' where technical pleading requirements are rejected in favor of an approach designed to reach the merits of an action."  *Bledsoe v. Community Health Systems, Inc.*, - - - F.3d - - -, 2007 WL 2492439 at *6 (6th Cir., Sept. 6, 2007) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

In his second amended complaint Plaintiff expressly alleges that in addition to the incidents regarding the January 23, 2003 and February 21, 2003 mailings, Defendant Tucker opened his confidential legal mail - outside his presence - in excess of 50 times.  (Dkt. #89 at ¶¶ 118b, 143).  As Defendant correctly observes, Plaintiff did not provide in his second amended complaint any specifics regarding these additional alleged incidents.  Plaintiff counters that Defendants had in their possession and control the relevant records concerning the specifics of these claims.

During most of the time period relevant to these claims,[3] MDOC policy authorized prison officials to open a prisoner's legal mail outside his presence - even if the prisoner requested otherwise. *See* Michigan Policy Directive 05.03.118 ¶¶ AA-EE (effective May 1, 2002); Michigan Policy Directive

---

[3]  The time period relevant to Plaintiff's claims regarding the opening of his legal mail is that period of time during which he was incarcerated at the Muskegon Correctional Facility (MCF) where Defendant Tucker was employed.  Plaintiff asserts that he arrived at MCF on April 11, 2002.  (Dkt. #89 at ¶ 45).  Defendant Tucker asserts that Plaintiff transferred out of MCF on January 6, 2004.  (Dkt. #243).  The record contains no evidence establishing with certainty the accuracy of these dates, but neither party disputes the accuracy of the other's assertion in this regard.

05.03.118 ¶¶ CC-GG (effective November 1, 2002); Michigan Policy Directive 05.03.118 ¶¶ DD-GG (effective December 19, 2003).[4]  Pursuant to these policies, a prisoner could nonetheless request that his legal mail receive "special handling."  *See* Michigan Policy Directive 05.03.118 ¶ AA (effective May 1, 2002); Michigan Policy Directive 05.03.118 ¶ CC (effective November 1, 2002); Michigan Policy Directive 05.03.118 ¶ DD (effective December 19, 2003).  If a prisoner requested that his legal mail be so processed, prison officials were required to maintain a log "to record all incoming legal mail receiving special handling."  *See* Michigan Policy Directive 05.03.118 ¶ CC (effective May 1, 2002); Michigan Policy Directive 05.03.118 ¶ EE (effective November 1, 2002); Michigan Policy Directive 05.03.118 ¶ EE (effective December 19, 2003).  Pursuant to policy, these logs were required to identify, among other information, (1) the date the mail was received; (2) the name of the prisoner to whom it was sent; and (3) the name of the person sending the mail.  *See* Michigan Policy Directive 05.03.118 ¶ CC (effective May 1, 2002); Michigan Policy Directive 05.03.118 ¶ EE (effective November 1, 2002); Michigan Policy Directive 05.03.118 ¶ EE (effective December 19, 2003).

In short, pursuant to these policy directives, Defendant Tucker should have had within her possession and control detailed information concerning the incidents alleged in Plaintiff's second amended complaint.  The Court notes that Plaintiff unsuccessfully attempted - on several occasions - to obtain copies of these logs through discovery.  (Dkt. #240, Exhibits B-C).  In response to Plaintiff's First Request for Interrogatories, Defendant Tucker asserted that the "Computerized Legal Log. . .[c]urrently cannot be accessed."  (Dkt. #240, Exhibit B, Interrogatory #15).  In response to Plaintiff's First Request for Production of Documents, Defendant Tucker responded that she "cannot find" the incoming legal

---

[4] As described in detail below, certain portions of this policy were found to be unconstitutional in *Sallier v. Brooks*, 343 F.3d 868 (6th Cir. 2003), issued on September 18, 2003.

mail logs from January 1, 2000, through December 31, 2002. (Dkt. #240, Exhibit C). In response to Plaintiff's Second Request for Production of Documents, Defendant Tucker asserted that she "cannot find" the incoming legal mail logs for the time period February 1, 2000, through November 1, 2002. *Id.* Because of Defendant Tucker's inability to produce the requested information (which MDOC policy required to be maintained) Plaintiff has been unable to supplement his pleadings with more details regarding the alleged incidents in question.

In light of these particular Policy Directives, as well as Federal Rule of Civil Procedure 8, the Court finds that the allegations contained in Plaintiff's second amended complaint were sufficient to put Defendant Tucker on notice regarding Plaintiff's allegation that Defendant Tucker (in addition to the two incidents described in detail above) opened Plaintiff's confidential legal mail - outside his presence - in excess of 50 times. The Court notes that Plaintiff's claims may ultimately fail due to his inability to present facts sufficient to merit relief, but to the extent that Defendant Tucker asserts that Plaintiff's complaint lacks sufficient particularity, the Court is unpersuaded considering that Defendant was required (pursuant to MDOC policy) to maintain records detailing the specifics of the transactions allegedly at issue.

### 2. *Sallier v. Brooks*

Before evaluating Defendant Tucker's qualified immunity claims, it is necessary to first discuss in some detail the Sixth Circuit's decision in *Sallier v. Brooks*, 343 F.3d 868 (6th Cir. 2003).

In this case, the prisoner-plaintiff (Sallier) alleged that two mailroom clerks employed by the MDOC (Brooks and Ramsey) violated his "constitutional rights" by unlawfully "opening, censoring, and interfer[ing with his] legal mail." *Id.* at 871. The incidents in question involved various

types of legal mail which were mailed to Sallier between the dates of March 30, 1994, and February 5, 1996. *Id.* at 872. Prior to trial, the defendants asserted a claim of qualified immunity. *Id.* at 871. The court did not rule on defendant's qualified immunity claim and instead "instructed the jury to determine whether certain correspondence was in fact legal mail and whether that correspondence had been improperly opened outside of Sallier's presence." The jury found in Sallier's favor on 13 of his 20 claims. The defendants appealed to the Sixth Circuit on the question of qualified immunity. *Id.*

   The Sixth Circuit first concluded that the trial erred by failing to address the defendants' qualified immunity defense until after the jury had determined as a factual matter whether each item of mail qualified as constitutionally protected legal mail. *Id.* at 873. The court instead held that "[t]he determination of whether particular kinds of correspondence qualify for the constitutional protection accorded a prisoner's 'legal mail' is a question of law properly decided by the court, not one of fact that can be submitted to a jury."

   With respect to the merits of Sallier's claims, the court observed that while a prisoner's right to receive mail is protected by the First Amendment, prison officials "may impose restrictions that are reasonably related to security or other legitimate penological objectives." *Id.* Moreover, while prison officials may "open" prisoners' incoming mail if accomplished in pursuit of legitimate penological objectives, the opening of incoming legal mail causes "heightened concern" because "a prison's security needs do not automatically trump a prisoner's First Amendment right to receive mail, especially correspondence that impacts upon or has import for the prisoner's legal rights, the attorney-client privilege, or the right of access to the courts." *Id.* at 874.

   In an attempt to balance the legitimate security needs of the institution with the constitutional rights of prisoners, courts have approved prison policies which permit prison officials to

open incoming legal mail for contraband in the prisoner's presence. *Id.* (citing *Wolff v. McDonnell*, 418 U.S. 539, 577 (1974)). The Sixth Circuit, in *Knop v. Johnson*, 977 F.2d 996, 1012 (6th Cir. 1992), found constitutional an opt-in system that permitted prison officials to open any mail sent to a prisoner unless the prisoner affirmatively requested that "privileged mail" (i.e., mail sent by a court or attorney) be opened in his presence. *Sallier*, 343 F.3d at 874. The *Sallier* court observed, however, that not every item of mail which a prisoner receives "from a legal source will implicate constitutionally protected legal mail rights." *Id.* Accordingly, the court undertook to identify the various categories of "legal mail" and articulate the degree of protection accorded to each.

### a.    Correspondence from Professional Organizations

One of the items of mail at issue in *Sallier* was correspondence sent by the American Bar Association (ABA). *Id.* at 875. Observing that the ABA "is not a direct-services legal organization and generally does not provide legal advice," the court held that in the absence of a "specific indication" that the contents are "to be opened only in the presence of the prisoner" such mail does not qualify as constitutionally protected legal mail.

### b.    Correspondence from County Clerks

Sallier also received several items of mail from "various county clerks." *Id.* With respect to these items, the court observed that a county clerk can neither provide legal advice to a prisoner nor act on the prisoner's behalf. *Id.* at 876. Thus, mail from a county clerk "simply does not implicate a prisoner's right of access to the courts, of petitioning the government to redress grievances, or of competent representation by counsel." Accordingly, absent clear instruction that the contents are to be

opened only in the presence of the prisoner, such mail does not qualify as constitutionally protected legal mail.

      c.     Correspondence from State and Federal Courts

The court recognized that this category of correspondence presented "the most difficult question" because it "will frequently, but not necessarily, involve a currently pending legal matter affecting the prisoner's rights." *Id.* The court resolved this difficulty by holding that

> In order to guard against the possibility of a chilling effect on a prisoner's exercise of his or her First Amendment rights and to protect the right of access to the courts, we hold that mail from a court constitutes 'legal mail' and cannot be opened outside the presence of a prisoner who has specifically requested otherwise.

*Id.* at 877.

      d.     Correspondence from Attorneys

The court observed that correspondence from attorneys (including the Attorney General) constitutes "the very essence of 'legal mail.'" *Id.* Accordingly, the court held that

> We find that the prisoner's interest in unimpaired, confidential communication with an attorney is an integral component of the judicial process and, therefore, that as a matter of law, mail from an attorney implicates a prisoner's protected legal mail rights. . .There is no penological interest or security concern that justifies opening such mail outside of the prisoner's presence when the prisoner has specifically requested otherwise.

*Id.* at 877-78 (internal citation omitted).

After determining which categories of correspondence enjoy status as constitutionally protected legal mail, the *Sallier* court turned its attention to the defendants' qualified immunity claims.

Having determined that correspondence from the ABA and the various county clerks did not constitute protected legal mail, the court, rather than assess the defendants' claims of qualified immunity, simply set aside the jury verdicts in Sallier's favor regarding such mail items. *Id.* at 875-76. The Court, therefore, only undertook a qualified immunity analysis with respect to the correspondence which the court found constituted protected legal mail. *Id.* at 878-80.

The doctrine of qualified immunity recognizes that government officials must be able to carry out their duties without fear of harassing litigation. *See Davis v. Scherer*, 468 U.S. 183, 195 (1984). As is well recognized, they can do so only if they reasonably can anticipate when their conduct may give rise to liability for damages, and if unjustified lawsuits are quickly terminated. *Id.*

Generally, when government officials perform discretionary functions, they are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See See v. City of Elyria*, - - - F.3d - - - , 2007 WL 2710829 at *6 (6th Cir., Sept. 19, 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Whether an official can be held liable for allegedly unlawful conduct turns on the objective legal reasonableness of the official's actions, assessed in light of the legal rules that were clearly established at the time of the conduct in question. *City of Elyria*, 2007 WL 2710829 at *6. The question of whether an official is entitled to qualified immunity is a legal question for the trial court to resolve prior to trial. *Sallier*, 343 F.3d at 878. The plaintiff bears the burden of proof to establish that the defendant is not entitled to qualified immunity. *City of Elyria*, 2007 WL 2710829 at *6.

To evaluate a defendant's claim of qualified immunity, the Court must employ a two-step inquiry. First, evaluating the allegations in a light most favorable to the plaintiff, the court must determine whether such allegations establish the violation of a constitutional right. Assuming such is

-24-

the case, the court must then determine whether the right in question was clearly established when the defendant acted. *Id.* In the context of qualified immunity, a right is "clearly established" if the contours of such are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The plaintiff does not have to establish that "the very action in question" has previously been held unlawful, but the unlawfulness of the conduct must be apparent in light of pre-existing law. *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

   With respect to correspondence from courts, the court observed that at the time that the defendants acted there existed a "lack of clarity" as to whether such correspondence constituted protected legal mail. *Id.* at 879. Finding that the right in question was not clearly established when the defendants acted, the court found that they were entitled to qualified immunity as to claims involving the opening of correspondence sent to Sallier from a court.

   The court noted, however, that correspondence sent to a prisoner from an attorney was "an altogether different story." In this respect, the court noted that it had "clearly indicated" in *Muhammad v. Pitcher*, 35 F.3d 1081 (1994), that "attorney mail was 'legal mail' and that a prisoner is entitled to be present when his attorney mail is opened." *Id.* Accordingly, the court denied the defendants' claim of qualified immunity regarding Sallier's "attorney mail" claims, finding that Sallier's right to be present when such mail was opened had been clearly established since 1994. *Id.* at 879-80.

   In sum, correspondence from professional organizations or clerks of court (absent specific indications that such is to be opened in the prisoner's presence) does not qualify as constitutionally protected legal mail and can, therefore, be opened outside the prisoner's presence. Correspondence from a court to a prisoner does qualify as protected legal mail. However, this right was not clearly established

until the September 18, 2003 decision by the *Sallier* court.  Finally, correspondence from an attorney to a prisoner also qualifies as protected legal mail, a right which has been clearly established since 1994. With this backdrop, the Court will now analyze Defendant Tucker's claims of qualified immunity.

       3.     January 23, 2003 and February 21, 2003 Mailings

As discussed above, Plaintiff alleges that this correspondence was sent by an attorney who was representing him in a different matter.  Defendant Tucker does not dispute this.  She likewise does not dispute Plaintiff's claim that she opened this mail outside Plaintiff's presence, despite the fact that Plaintiff had previously requested that he be present when his legal mail was opened.  Instead, Defendant Tucker asserts that because these two incidents occurred prior to the Sixth Circuit's *Sallier* decision, she is entitled to qualified immunity.

As detailed above, the court in *Sallier* held that the right of a prisoner to be present when his legal mail was opened had been clearly established since 1994, more than eight (8) years *before* the conduct presently at issue.  As previously noted, Plaintiff had requested prior to May 2002 that he be present when his legal mail was opened.  Thus, Defendant Tucker's claim that she is entitled to qualified immunity as to these two claims is without merit.

       4.     Remaining Mail Claims

As discussed above, Plaintiff claims that Defendant Tucker opened his legal mail - outside his presence - on more than fifty (50) other occasions.  As also discussed above, the Court finds that the allegations in Plaintiff's second amended complaint regarding these alleged incidents is

sufficient to satisfy the Rule 8 pleading standards.  However, now that Defendant Tucker has asserted

a claim of qualified immunity, the burden shifts to Plaintiff to establish that she is not entitled to such.

The only evidence which Plaintiff has submitted with respect to these additional claims

is copies of twenty-four (24) envelopes, the contents of which Plaintiff asserts Defendant Tucker opened

outside his presence.  (Dkt. #240 at 11-12; Dkt. #240, Exhibit F).  Plaintiff has yet to offer any other

evidence (or even allegations) regarding these alleged incidents.  The Court understands that Plaintiff

has been unable to uncover through discovery the incoming mail logs which MDOC policy required to

be maintained.  However, Plaintiff has not moved the Court for any type of relief regarding these

particular discovery requests.  Absent evidence of wrongdoing on Defendant's part, therefore, Plaintiff's

failure to obtain facts through discovery to support his claims cannot be ignored.  Accordingly, the Court

must evaluate Defendant Tucker's claim of qualified immunity based on the record presently before the

Court.  Consistent with the approach employed by the *Sallier* court, the Court will assign each item of

correspondence to one of the four categories identified above and assess them accordingly.


a.      Correspondence from Professional Organizations and Clerks of Court

Exhibits F-17 and F-19 were mailed to Plaintiff by clerks of court and do not indicate that

the contents are confidential or should be opened only in Plaintiff's presence.  Thus, Defendant Tucker

is entitled to qualified as to these items as they do not qualify as protected legal mail.  Exhibit F-14 was

mailed to Plaintiff by the Michigan ACLU, a professional organization.  The envelope states that the

contents are "confidential legal mail open only in prisoner presence attorney/client privilege."  Thus, this

correspondence qualifies as protected legal mail.  This mail is postmarked December 1, 2003, more than

two months following the *Sallier* decision.  Accordingly, Defendant Tucker is not entitled to qualified

immunity as to this claim because Plaintiff's right to have this correspondence opened in his presence was clearly established as of the date Defendant Tucker allegedly opened this mail.

        b.     Correspondence from Courts

Exhibits F-4, F-7, F-13, and F-18 were mailed to Plaintiff by various courts.  As previously discussed, such is constitutionally protected legal mail.  However, in the context of Defendant Tucker's claim of qualified immunity the date that such correspondence was mailed to Plaintiff is significant because Plaintiff's right to be present when this type of correspondence is opened was not clearly established until September 18, 2003.  The postmarks on the first three envelopes are not discernable and the postmark on the fourth item reveals that it was mailed in 2002.  Accordingly, Defendant Tucker is entitled to qualified immunity as Plaintiff's claims involving these particular items.

        c.     Correspondence from Attorneys

Exhibits F-1, F-2, F-5, F-6, F-8, F-9, F-10, F-11, F-12, F-15, F-16, F-20, F-21, F-22, F-23, and F-24 were mailed to Plaintiff by various attorneys.  As previously discussed, Plaintiff's right to be present when his "attorney mail" was opened was clearly established in 1994.  These particular items were all mailed to Plaintiff long after 1994.  Accordingly, Defendant Tucker is not entitled to qualified immunity as to these particular claims.

        d.     Remaining Claims

Exhibit F-3 does not identify who sent this correspondence to Plaintiff.  Because Plaintiff cannot establish that such qualifies as protected legal mail, Defendant Tucker is entitled to qualified

immunity as to this claim.  Finally, as for any other items of correspondence which constitute part of the allegations contained in Plaintiff's second amended complaint, Plaintiff has failed to establish that any of said correspondence qualifies as protected legal mail.  Accordingly, Defendant Tucker is entitled to qualified immunity as to such claims.

In sum, with respect to Plaintiff's claim that Defendant Tucker unlawfully opened his legal mail on more than fifty occasions, Defendant Tucker is entitled to qualified immunity except as to the claims associated with Exhibits Exhibits F-1, F-2, F-5, F-6, F-8, F-9, F-10, F-11, F-12, F-14, F-15, F-16, F-20, F-21, F-22, F-23, and F-24.  Thus, the Court recommends that Plaintiff's legal mail claims concerning these particular exhibits, as well as the January 23, 2003 and February 21, 2003 mailings, be permitted to go forward.

B.    Retaliation

As discussed above, Plaintiff asserts that on March 13, 2003, Defendant Tucker notified him that she had "disposed" of the mail determined by Defendant Mikkelsen to constitute contraband. (Dkt. #89 at ¶125).  Plaintiff asserts that Defendant Tucker disposed of these items in retaliation for Plaintiff having previously filed grievances against Tucker.  *Id.* at ¶ 131.

Even if Plaintiff could establish the first two prongs of the retaliation analysis, he cannot satisfy the third prong.  Plaintiff must establish that the adverse action taken against him was motivated, at least in part, by the protected conduct in which he engaged.  As previously noted, "bare allegations of malice" are insufficient to state a constitutional claim, as Plaintiff must instead establish "that his protected conduct was a motivating factor" behind the allegedly retaliatory action taken.  *Thaddeus-X*,

175 F.3d at 399.  Plaintiff must articulate "a chronology of events from which retaliation may plausibly be inferred." *Desmone v. Adams*, 1998 WL 702342 at *3 (6th Cir., Sep. 23, 1998) (citations omitted).

Plaintiff has failed to allege a chronology of events from which a reasonable person could conclude that Plaintiff was the subject of improper retaliation.  Instead, Plaintiff has simply alleged in wholly conclusory fashion that Defendant Tucker subjected him to improper retaliation.  Such allegations fail to satisfy the relevant standard.  *See, e.g., Brown v. Gerth*, 2007 WL 2480526 at *7 (W.D. Mich., June 6, 2007) (citations omitted) ("[c]onclusory allegations of retaliatory motive with no concrete and relevant particulars fail to raise a genuine issue of fact for trial").  Accordingly, the Court recommends that Defendant Tucker be granted summary judgment as to this particular claim.

### C.    Conversion

Plaintiff asserts that Defendant Tucker unlawfully seized the items contained in the January 23, 2003 mailing.  (Dkt. #89 at ¶ 184).  Plaintiff asserts that this action constitutes conversion under Michigan law.  *Id.*

The tort of conversion is any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein.  *See Head v. Phillips Camper Sales & Rental, Inc.*, 593 N.W.2d 595, 603 (Mich. Ct. App. 1999) (quoting *Foremost, Ins. Co. v. Allstate Ins. Co.*, 486 N.W.2d 600 (Mich. 1992)).  Conversion occurs "at the point that such wrongful dominion is asserted." *Wiencek v. Willis*, 1997 WL 33344868 at *2 (Mich. Ct. App., July 25, 1997) (citations omitted); *Gum v. Fitzgerald*, 262 N.W.2d 924, 927 (Mich. Ct. App. 1978) (citations omitted).

As a prisoner, Plaintiff is not permitted to possess any personal property he desires.  Instead, the amount and type of property which Plaintiff may possess is determined by state law and

regulation.  *See* Mich. Comp. Laws § 800.42.  Plaintiff has no right to possess property which does not conform with such laws or regulations.  *See Martin v. Stine*, 542 N.W.2d 884, 890, (Mich. Ct. App. 1995).  Prison officials, therefore, have the right to confiscate prisoner property in violation of the relevant laws or regulations.  *Id.*

Defendant Tucker issued a mail rejection regarding certain contents of the January 23, 2003 mailing because such violated the property limitations articulated by MDOC Policy.  (Dkt. #213, Exhibit 4).  This is not disputed.  Prison officials were, therefore, authorized to seize Plaintiff's property to determine whether Plaintiff was permitted to possess such.  As this seizure was entirely appropriate, Defendant Tucker's action cannot have constituted conversion.  Following an administrative hearing it was determined that a portion of the seized property was, in fact, possessed by Plaintiff in violation of MDOC regulations.  (Dkt. #213, Exhibit 5).

One of the most fundamental methods by which order and security is maintained in a prison facility is through the inspection and control of prisoner personal property.  Under Michigan law, Defendant Tucker had the authority to seize Plaintiff's property to determine whether such complied with the relevant laws and regulations.  The Court recommends, therefore, that Defendant Tucker be granted summary judgment as to this particular claim.


D.      Due Process

As discussed above, following the rejection of the January 23, 2003 mailing, Plaintiff requested a hearing on the matter.  Defendant Mikkelsen subsequently completed an Administrative Hearing Report in which he concluded that certain items included in the January 23, 2003 mailing violated MDOC policy.  (Dkt. #213, Exhibit 5).  Plaintiff does not dispute the authenticity of this

document or the accuracy of the Report's contents, but instead asserts that Defendant Mikkelsen did not conduct a hearing in the matter as requested. Plaintiff asserts that this failure violated his right to due process. Defendant Mikkelsen asserts that he does not recall whether Plaintiff appeared in person during the administrative hearing.

Pursuant to the Due Process Clause of the Fourteenth Amendment, before depriving an individual of life or a constitutionally protected liberty or property interest the state must afford the individual with notice and an opportunity to be heard. *See Brentwood Academy v. Tennessee Secondary School Athletic Association*, 442 F.3d 410, 433 (6th Cir. 2006), *rev'd on other grounds*, 127 S.Ct. 2489 (2007); *Harris v. City of Akron*, 20 F.3d 1396, 1401 (6th Cir. 1994).

Plaintiff was given notice of the administrative hearing and was given opportunity to prepare a statement regarding the matter. (Dkt. #213, Exhibit 5). Defendant Mikkelsen's Report states that Plaintiff's statement was considered prior to rendering a decision. Thus, even assuming that Plaintiff was not permitted to appear in person before Defendant Mikkelsen, the Court finds that Plaintiff was nonetheless afforded constitutionally sufficient notice and opportunity to be heard. Accordingly, the Court recommends that Defendant Mikkelsen be granted summary judgment as to this claim.

## IV.        Plaintiff's Motion to Hold Defendants' Motion in Abeyance

In his motion, Plaintiff requests "an enlargement of time" to respond to Defendants' motion for summary judgment. Plaintiff has since responded to Defendants' motion. Accordingly, the Court recommends that this motion be **denied as moot**.

V.           **Plaintiff's Motion for Deposition Transcripts**

As part of their motion for summary judgment Defendants included excerpts from their deposition of Plaintiff.  (Dkt. #213, Exhibit 10).  Plaintiff asserts that the accuracy of this transcript has not been properly verified as required by Rule 56(e) of the Federal Rules of Civil Procedure.  Plaintiff also asserts that he is entitled to a copy (at Defendants' expense) of this deposition transcript.

Rule 56(e) does require that "sworn or certified copies of all papers" be submitted. Defendants have since submitted the required certification regarding Plaintiff's deposition.  (Dkt. #232, Exhibit 1).  As for Plaintiff's request that Defendants provide him (free of charge) copies of the transcript of his deposition, courts have long held that parties must bear their own litigation expenses, including the cost of securing transcripts of depositions.  *See* Fed. R. Civ. P. 30; *Braithwaite v. Rispoli*, WL 2007 1795880 (D. Del., June 21, 2007); *Rivera v. DiSabato*, 962 F.Supp. 38, 38-41 (D.N.J. 1997). Accordingly, the Court recommends that Plaintiff's motion be **denied**.

## CONCLUSION

For the reasons articulated herein, the undersigned recommends that Plaintiff's <u>Motion to Hold Defendants' Dispositive Motion in Abeyance</u>, (dkt. #224), be **denied**; Plaintiff's <u>Motion that Defendant Produce Complete and Sworn Deposition Transcripts</u>, (dkt. #229), be **denied**; and <u>Defendants Brevard, Mikkelsen and Tucker's Rule 56(b) Motion for Summary Judgment</u>, (dkt. #212), be **granted in part and denied in part**.  Specifically, the Court recommends that Defendants' motion for summary judgment be granted and Plaintiff's claims dismissed, except for Plaintiff's incoming legal mail claims detailed in section III. herein.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

Respectfully submitted,

Date:  September 24, 2007                                     /s/ Ellen S. Carmody_____
                                                            ELLEN S. CARMODY
                                                            United States Magistrate Judge